Filed 10/15/14  P. v. Walker CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

|  |  |
|---|---|
| THE PEOPLE, | C069309 |
| Plaintiff and Respondent, | (Super. Ct. No. 07F05486) |
| v. | |
| RAHRU WALKER, | |
| Defendant and Appellant. | |

Defendant Rahru Walker appeals from a judgment of conviction following a jury trial.  Defendant was convicted of one count of oral copulation by force, violence, duress, menace and fear (Pen. Code, § 288a, subd. (c)(2)[1]), two counts of forcible rape (§ 261, subd. (a)(2)), and one count of first degree residential burglary (§ 459).  An allegation that these crimes were committed during the commission of a burglary (§ 667.61,

---

[1] Undesignated statutory references are to the Penal Code in effect at the time of defendant's crimes.

1

subd. (d)(4)) was found true by the jury, and the court found true that defendant had suffered a conviction for a prior rape, alleged as a strike.  (§§ 667, subd. (b)-(i), 1170.12.) On appeal, defendant contends that:  (1) the court violated his right to due process in admitting evidence of a prior sexual offense under Evidence Code section 1108; (2) his counsel was ineffective in failing to seek redaction of certain documents introduced by the prosecution under Evidence Code section 1108; and (3) the court erred in imposing consecutive terms because the offenses occurred on one occasion.

We conclude that the trial erred when it imposed consecutive terms on counts one and two under the mandatory provisions in sections 667.61, subdivision (i), and 667.6, subdivision (d), and order remand for the trial court to exercise its discretion to impose consecutive or concurrent terms as to those counts.  In all other respects, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### Charged Offenses

The victim, L.R., lived with her three children in a two-bedroom apartment on the ground floor of an apartment complex.  L.R. was romantically involved with Joe Dabbs, who lived on the other side of the complex with his wife, R.V., and their children.  In late May of 2007, L.R. mistakenly believed that she was pregnant with Dabbs' child and had decided to move to away from the apartment complex because of ongoing disputes with R.V. and because her lease was expiring.

On May 30, 2007, L.R. was packing and cleaning her apartment and her neighbor, Shavandra, was helping her.  While L.R. and Shavandra were sitting on the stairs outside the apartment waiting for L.R.'s uncle to arrive with a U-Haul, defendant came by attempting to sell DVDs.  Shavandra knew defendant but L.R. did not.  L.R. testified she had never seen defendant before that day.[2]  Later, while L.R. and Shavandra were

---

[2] The reporting police officer testified that L.R. told him she knew of defendant and had seen defendant multiple times.

2

cleaning, defendant returned with some hamburgers and came inside the apartment, sat on the couch, and talked with Shavandra. Dabbs walked in while defendant was there and became upset when he saw defendant. L.R. went outside to speak with Dabbs, who asked who defendant was and why he was there. L.R. explained that defendant knew Shavandra. Dabbs told her "I want him out." Dabbs went inside and "had words" with defendant, who said that L.R. had set him up. After defendant left, Dabbs and L.R. continued arguing.

Later that day, after Dabbs and Shavandra had both left the apartment, defendant knocked on L.R.'s door. L.R. was there alone with two of her children. Defendant had three or four other men with him who L.R. did not know and asked her where her boyfriend was. L.R. assumed defendant wanted to fight Dabbs, and she told him that Dabbs was not there and did not live with her. Defendant then asked L.R. if they were "good" or "cool" and left with his friends.

Later that night, L.R. fell asleep on a couch in the living room and two of her children slept on the floor in the same room. Around 1:00 or 2:00 in the morning, L.R. heard a knock at the door and ignored it, falling back asleep. She awoke again when defendant, who was then inside her apartment, walked past the couch. She said, "What the fuck?" and defendant responded that he had knocked but she did not answer. L.R. "got smart" with defendant and told him that "a normal person would have left if somebody didn't answer the door, not come through their window." Defendant replied, "You must think I'm crazy." While standing over her, defendant said he wanted to check on her and see what kind of person her "baby's daddy" is. Defendant had a big bottle of alcohol with him and sat next to L.R. on the couch. L.R. could not understand everything he was saying because he was very intoxicated. She was "shocked" and trying to figure out what to do. Defendant began rubbing L.R.'s leg with his hand and laughing, and L.R. told him to move to the other side of the couch "because he was doing too much."

3

Defendant pulled out a pipe containing marijuana and said, "Let's smoke." She said, "okay, just whatever" and "hit it maybe twice."

L.R testified that defendant stopped laughing. He "got serious and he told [L.R.] he's going to show [her] how crazy he is." Defendant got up, and L.R. started to cry because she "knew something was going to happen." He then told her to "shut the . . . fuck up" and that she was "crying too much." He then asked her if she had seen scary movies. When L.R. replied that she had, defendant told her, "Then you'll know to shut the fuck up" because if her children woke up, "it's going to really turn all bad." L.R. was scared and concerned for her children. Defendant said she was talking too much, raised his fist and told her that if she did not "shut the fuck up," she "may lose a couple of teeth." At that point, defendant removed L.R.'s pajama pants, forced her legs apart, and performed oral sex on her. While defendant orally copulated L.R, he told her he wanted her to like it, wanted her to like him, he liked it rough and he wanted her to act like she enjoyed it. L.R. cried. Her main concern was her children, so she avoided doing anything to make defendant more upset and risk getting them hurt. However, she did not make it easy for him; she closed her legs while defendant tried to keep them open. The covers were on them as this was occurring, but L.R. was not the one who covered them.

Defendant got on top of L.R. and inserted his penis into her vagina. L.R. testified, "By that time I made eye contact with my son, so I seen that my son was up. And I tried to tell him that . . . you are doing this in front of my son, but once again I was talking too much. I was told to shut the fuck up." L.R.'s son was approximately 10 years old at the time.[3]

---

[3] L.R.'s son was born in February 1997 and the crimes occurred in May 2007.

L.R. said that while defendant was having intercourse with her, she was "trying to play it off" and "be cool" and asked if defendant had a condom, and he said no and "proceeded on."[4]

After defendant raped L.R., she asked if she could go to the bathroom, and he allowed her to do so. She was not in the bathroom long before defendant asked what was taking her so long, and she rushed out because she was worried about her children.

When L.R. came out, defendant told her they were going to have sex again. L.R. testified, "By this time the light is on. My son is fully up. He's aware my son is fully up to the point where he grabs the closest thing to him, which was a pillow, and covers his face for a brief second."

L.R. told defendant that she needed to finish cleaning up the apartment because her uncle was coming to pick up her family early in the morning, but defendant told her that they were going to have sex again. L.R. testified that she was crying very loudly at this point because her son was watching, and defendant instructed her to suck his nipple.[5] She did as defendant instructed while making eye contact with her son. L.R. could not be quiet; she was extremely upset. At some point, L.R.'s son put his head under the covers. Defendant again forced himself on top of L.R. and raped her again, this time without the blankets covering them. L.R. tried to distract defendant by telling him that she was pregnant and he was hurting her. Defendant apologized for being so rough. It seemed to L.R. like it went on forever.

Defendant finally left the apartment around 6:00 a.m. As he walked out, he told L.R. he would bring her lunch later. He also told L.R. that he knew people and knew where she stays, which L.R. took as a threat.

---

[4] The reporting officer testified that L.R. told him defendant asked her if she had a condom.

[5] L.R. did not tell the reporting officer that defendant forced her to suck his nipple.

After defendant left, L.R. ran to a neighbor's apartment. On her way there, L.R. ran into one of Dabb's friends and told him to get Dabbs. Dabbs and his wife, R.V., both came and R.V. called the police.

The reporting officer, Matthew Wollman, arrived and interviewed L.R. and her son. Officer Wollman took L.R. to U.C. Davis Medical Center, where she was examined. The examining nurse practitioner found no external injuries on L.R. Swab samples were collected from L.R.'s breast, vaginal, cervical, and anal areas.

After conducting DNA testing on the swabs, criminalist Joy Viray determined that defendant could not be excluded as the contributor of DNA taken from L.R.'s breast and vagina. Dabbs, however, was excluded as a contributor.

On December 20, 2007, the Sacramento Police Department prepared a photographic lineup of six photos, and L.R. selected defendant's photo as the man who raped her.

The prosecution introduced evidence of defendant's 1995 rape of 15-year-old P.P. We discuss that evidence in more detail *post* in connection with defendant's Evidence Code section 1108 contentions.

Defendant did not present evidence on his own behalf.

**Verdicts and Sentencing**

The jury convicted defendant of all charges and found true the special allegation that he committed the offenses during the commission of a burglary. In a bifurcated court trial, the court found that defendant had suffered the prior conviction as alleged.

The court sentenced defendant to consecutive indeterminate terms of 25 years to life on counts one through three, doubled pursuant to section 667, subdivisions (b) through (i), totaling 150 years to life. We discuss the consecutive sentencing in more detail, *post*. The court imposed the upper term of six years on count four, doubled to 12 years pursuant to section 667, subdivisions (b) through (i), but stayed the sentence pursuant to section 654.

6

## DISCUSSION

### I. Admission of Prior Sexual Offenses

Over defense objection, the prosecution introduced evidence of defendant's prior sexual offense under Evidence Code section 1108. Subdivision (a) of Evidence Code section 1108 provides that "[i]n a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352." Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

Defendant contends that the court erred by admitting this evidence because: (1) the admission of evidence of prior sexual offences under Evidence Code section 1108 violates due process, and (2) the trial court abused its discretion in failing to exclude the inflammatory aspects of the prior sexual offense.

### A. Background

#### 1. Motion In Limine

Prior to trial, the prosecution filed a motion in limine requesting that the court admit defendant's prior sexual offenses against P.P. and another woman, W.D.[6] Defendant's counsel filed a written opposition to the motion and requested an Evidence Code section 402 hearing to prevent the jury from hearing inflammatory facts about the event involving P.P., including that she was 15 years old and a virgin at the time of the offense, and to determine whether P.P. was forced to report a consensual act as a forcible rape when defendant had a good faith belief that she was not a minor.

---

[6] Although the court found the prior sexual offense against W.D. admissible, ultimately the prosecution did not introduce any evidence of this offense at trial.

7

The trial court held a hearing and conducted an Evidence Code section 352 analysis. The court ruled that there were several similarities between the charged offense and the uncharged offenses and the evidence was therefore probative on the issue of consent and L.R.'s credibility. The court concluded that P.P.'s age was not "particularly problematic" but expressed concern about the "virginity issue," ultimately finding that it was "an important detail with regard to the entirety of the offense." The court ruled that the prior offenses were not particularly inflammatory compared to the charged offense, that they were not remote, the presentation of the evidence would not result in an undue consumption of time, nor would the jury be confused in light of the instructions it would be provided, and that the probative value of those offenses was high because based on defendant's statements to police, it appeared his defense was going to be consent. The court concluded by saying, "So doing my weighing and balancing under [Evidence Code section] 352, I find that the evidence is properly admissible." The trial court also ruled that there was no need for an Evidence Code section 402 hearing, basing its rulings on the prosecution's offer of proof in its motion, but told the defense it could revisit the request.

Just before the introductory jury instructions and opening statements, the prosecutor asked for permission to introduce documentary evidence of the convictions resulting from the prior offenses involving P.P. The prosecutor argued it was necessary to prevent the jury from speculating about what happened.

The court allowed the documentary evidence, subject to a possible objection concerning inadmissible hearsay, a concern raised by defense counsel. The court ruled that the documents resolved "the issue of certainty surrounding the offense." The court noted that defense counsel -- who had indicated earlier that the fact defendant pleaded guilty did not mean he was guilty -- did not have to concede the issue of certainty.

The court records showed that defendant pleaded guilty to raping P.P. The prison records showed that he served a prison sentence for that offense. However, the court

8

records also showed that defendant was originally charged with ten offenses, pleaded to two and received the "low term" of three years on "Ct. 6" and 1/3 middle term of "1 yr on Ct. 7" for a "Stipulated 4 yrs State Prison." The prison records showed that defendant lost credit because of prison disciplinary actions and was re-arrested while released on parole.

### 2. Prior Sexual Assault Evidence

In May 1995, P.P. and her friend, Shaylynn, were babysitting P.P.'s nieces at the home of P.P.'s sister. Shaylynn invited someone over who she had met in an Internet chat room. Three men, including defendant, came to the door, and Shaylynn let them into the house. Because P.P. did not know these men and they were much older, P.P. asked Shaylynn to make them leave. The men left to get some marijuana but later returned to the house, and Shaylynn let them in again. When the men returned, P.P. was sitting on the couch watching television, and the children were sleeping upstairs. Shaylynn went upstairs with one of the men, and defendant followed P.P. around the house, trying to talk to her. At some point, defendant asked P.P. how old she was, and she told him she was 15. P.P. went upstairs to the bathroom where defendant cornered her. Defendant told P.P. that he was going to "hit it no matter what." P.P. understood the term "hit it" to mean "have sex." P.P. told defendant "No, you're not, because I'm a virgin and you're not." She then managed to go to a bedroom where Shaylynn was with one of the other men and attempted to get her friend's attention. Defendant followed P.P. and tried to pull her pants down. P.P. rebuffed defendant and he threatened to blow the house up. He then pushed her back into the bathroom and pushed her head down, forcing her to perform oral sex on him. Afterward, defendant pushed her against the edge of the bathtub, and then held her arms down while he raped her. Defendant had a difficult time inserting his penis. Defendant put his mouth and fingers on P.P.'s vagina. Eventually, defendant was able to accomplish penetration. During this time, defendant kept threatening to blow the house up. P.P. was concerned about her nieces and that defendant

9

was going to shoot up or blow up the house. After the assault, P.P. was bleeding because she had been a virgin. Before defendant left with his friends, he told P.P. "that's what [you] get for playing sex games."

The trial court instructed the jury that if it found "that the defendant committed the uncharged offenses, you may, but are not required, to conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely to commit and did commit oral copulation by force and rape as charged here. If you conclude that the defendant committed the uncharged offenses, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of oral copulation by force and rape. The People must still prove each charge beyond a reasonable doubt. [¶] Do not consider this evidence for any purpose except for the limited purpose described above."

## B. Analysis

### 1. Due Process

Defendant argues that Evidence Code section 1108 is unconstitutional in that it violates his rights to due process and equal protection. He complains that "for more than three centuries the uniform practice in England and this country was to categorically exclude other crimes evidence when offered to prove a defendant's disposition to commit the charged offense" and that Evidence Code section 1108 "offends this deeply ingrained principle of Anglo-American jurisprudence."

As defendant acknowledges, his arguments have been rejected by the California Supreme Court in *People v. Falsetta* (1999) 21 Cal.4th 903, 910-922. However, defendant contends *Falsetta* was wrongly decided. We must follow our high court's precedent. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) Moreover, this court rejected similar arguments prior to the *Falsetta* decision in *People v. Fitch* (1997) 55 Cal.App.4th 172, 178-185. Accordingly, we reject defendant's

10

constitutional contentions for the reasons discussed in *Falsetta* and *Fitch*. (See also Fed. Rules Evid., rule 413(a) ["In a criminal case in which a defendant is accused of a sexual assault, the court may admit evidence that the defendant committed any other sexual assault. The evidence may be considered on any matter to which it is relevant"]; *Mejia v. Garcia* (9th Cir. 2008) 534 F.3d 1036, 1047, fn 5 [rejecting a California defendant's federal habeas corpus claim that Evidence Code section 1108 is unconstitutional and pointing out analogous Federal Rules of Evidence and Ninth Circuit precedent holding that the Federal Rules do not violate due process].)[7]

### 2. Abuse of Discretion

Defendant contends that the trial court abused its discretion in allowing "inflammatory aspects" of defendant's prior sexual assault. Again, we disagree.

"Under Evidence Code section 352, the trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time. [Citation.]" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124-1125.) We review a challenge to a trial court's choice to admit or exclude evidence under section 352 for abuse of discretion. (*People v. Harris* (1998) 60 Cal.App.4th 727, 736-737.) We will not disturb a trial court's exercise of discretion "except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice. [Citation.]" (*People v. Holford* (2012) 203 Cal.App.4th 155, 168 (*Holford*).)

"The governing test [under Evidence Code section 352] evaluates the risk of 'undue' prejudice, that is, ' "evidence which uniquely tends to evoke an emotional bias

---

[7] In his reply, brief defendant essentially acknowledges his constitutional arguments lack merit in California courts, but asserts that the admissibility of other acts of sexual misconduct is an "open federal issue" and that he raised the issue only to preserve it for federal review.

against the defendant as an individual and which has very little effect on the issues," ' not the prejudice 'that naturally flows from relevant, highly probative evidence.' [Citation.]" (*People v. Padilla* (1995) 11 Cal.4th 891, 925, overruled on other grounds, *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1.) "Evidence is not inadmissible under [Evidence Code] section 352 unless the probative value is 'substantially' outweighed by the probability of a 'substantial danger' of undue prejudice or other statutory counterweights." (*Holford*, *supra*, 203 Cal.App.4th at p. 167.)

Here, the trial court carefully considered the pleadings and arguments and properly weighed Evidence Code section 352 factors. The court reasoned that defendant's sexual offense against P.P. was relevant to the issues of consent and credibility. We agree. The crucial issue was L.R.'s credibility, as evidenced by defense counsel's closing argument to the jury where he argued there was a the lack of corroboration, emphasized there were no injuries, mentioned a well known case involving a false allegation of rape, highlighted inconsistencies (including whether L.R. knew defendant before the date of the crime), and contended it did not make any sense that L.R. became upset with Dabbs when he was angry about defendant being at her apartment earlier on the day of the offense.

The court determined that the evidence was probative because it was similar to the charged offense. Defendant, in the context of arguing about "inflammatory evidence" takes issue with the trial court's similarity analysis, contending the similarities identified by the trial court were not supported by the evidence. We disagree. The trial court found the two incidents similar in that: (1) both involved victims that defendant met for the first time on the day of the sexual assault and returned to assault;[8] (2) in both instances, as

---

[8] Defendant contends this factor was erroneous because there was evidence that the victim had told the investigating officer she knew of defendant and had seen him before. In assessing the trial court's evidentiary ruling, we must consider only the facts known to the court at the time the ruling was made. (*People v. Hendrix* (2013) 214 Cal.App.4th 216, 243.) During the hearing on the in limine motion, defendant did not alert the trial

12

soon as feasible, defendant found a way to seclude the victim and then immediately commenced the sexual assault; and (3) in both instances, there were other people in the immediate vicinity of the assault. We note that in addition to the similarities identified by the trial court, the assaults occurred in a location with which the victim was associated -- P.P.'s sister's house and L.R.'s apartment -- places with which defendant was not familiar. In both instances defendant was at the home, left, and returned. In both cases, children for whom the victims were responsible were present in the home. Both assaults began with defendant attempting to convince the victims to have consensual relations with him and when rebuffed, issuing threats, cornering them in positions from which they could not escape -- P.P. in the bathroom, L.R. on the couch with her children present -- and then using force to subdue them, followed by forcible oral sex by defendant on the victim, followed by forcible vaginal rape. Evidence Code section 1108 does not require that the uncharged sexual offenses be similar in all respects to the charged offense. (See *People v. Hollie* (2010) 180 Cal.App.4th 1262, 1276.) Here, the prior sexual assault is "similar enough to the charged offenses to have considerable probative value on the issue of lack of consent." (*Id.*)

Defendant argues that weighing heavily on the prejudice side of the Evidence Code section 352 equation is that the offense against P.P. was more "heart-rending" and "emotionally inflammatory" than the crime against L.R. because it involved a teenage girl whose "first sexual experience was a rape." The evidence of the sexual offense

court to L.R.'s statements to the investigating officer, and he did not point out this discrepancy to the trial court during the trial and ask the court to reconsider. The argument is forfeited. (See *People v. Champion* (1995) 9 Cal.4th 879, 919 [defendants forfeited their right to object to evidence on the ground that the evidence was inconsistent with the prosecutor's offer of proof when they failed to object on that ground during the trial].) Moreover, even considering L.R.'s statements to the reporting officer for the truth of the matter, the statements do not establish a relationship. Consequently, both cases are similar in that neither victim had a relationship with defendant prior to the day of the crime.

against P.P. was not unduly inflammatory; nor was it more inflammatory than the sexual assault against L.R. While the sexual assault against P.P. certainly was despicable, the sexual assault against L.R. was also despicable. Defendant raped L.R. multiple times over the course of several hours, and she testified that he was rough with her, causing her pain. Additionally, he committed part of the assault in front of L.R.'s 10-year-old son. We therefore cannot agree with defendant that the sexual assault against P.P. was substantially more emotionally inflammatory than the sexual assault against L.R.

Defendant complains that the fact P.P. was a virgin added nothing to the permissible inference that defendant has a propensity to commit sexual offenses. Yet, the fact that she was a virgin was probative on the issue of P.P.'s consent, an issue which, despite the fact that defendant was convicted, he did not concede. To the contrary, during the in limine motions, defense counsel specifically told the court that the fact defendant pleaded guilty did not mean he was guilty. During closing argument, defense counsel argued that P.P. lied about not wanting the men to visit and said her account should seem suspicious to the jury. He further argued that defendant was offered a deal, he was being "accused of rape with a girl that he finds out is 15," so he took a plea deal because the "odds and percentages didn't favor him." The argument implied defendant pleaded guilty only because he had consensual sex with an underage girl.

To the extent defendant suggests that the court erred in allowing evidence about P.P.'s age, that fact was also probative on the issue of whether P.P. consented. Moreover, the defense did not move to exclude the date this incident took place. Looking at P.P. and knowing the date of the incident, it seems likely the jury would extrapolate that she was young when the event occurred even if the jury was not told her age. Moreover, as we have noted, defendant used the victim's age as an explanation for why he pleaded guilty, implying that defendant did so because he had had sex with an underage girl.

Defendant contends the evidence of the prior assault on P.P. "dominated the trial." To the contrary, the evidence of the offense against P.P. did not consume an undue

14

proportion of time at trial. She was one of seven witnesses for the prosecution, and her testimony took up only 24 pages in the trial transcript of nearly 200 pages of testimony.

Defendant has not shown that the trial court exercised its Evidence Code section 352 discretion in an arbitrary, capricious, or patently absurd manner. We conclude the trial court did not abuse its discretion in admitting the evidence of the prior sexual offense.

### 3. Failure to Seek Redaction - Ineffective Assistance of Counsel Claim

Defendant contends that his trial counsel was ineffective in failing "to seek redaction of prejudicial matter in the documents proffered by the prosecution as part of the Evidence Code section 1108 evidence." He notes that counsel specifically requested an opportunity to review the records for inadmissible matter prior to their admission into evidence, received that opportunity and failed to seek redaction. He argues that because the records showed he had originally been charged with 10 offenses, received a "low term" under the terms of his plea agreement in the P.P. case, was subject to a disciplinary proceeding while in prison, and violated his parole, the jury may have used this evidence to convict him in this case because of the prior case. We are not persuaded.

To establish ineffective assistance of counsel, a defendant must show (1) counsel's performance was below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 691-692 [80 L.Ed.2d 674] (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217 (*Ledesma*).) " 'Surmounting *Strickland*'s high bar is never an easy task. [Citation.]' " (*Harrington v. Richter* (2011) 562 U.S. 86, __ [178 L.Ed.2d 624, 642] (*Richter*), quoting *Padilla v. Kentucky* (2010) 559 U.S. 356, 371 [176 L.Ed.2d 284, 297].)

Regarding defense counsel's performance, our high court has "repeatedly stressed 'that "[if] the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to

15

provide one, or unless there simply could be no satisfactory explanation," the claim on appeal must be rejected.' [Citations.] A claim of ineffective assistance in such a case is more appropriately decided in a habeas corpus proceeding. [Citation.]" (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.)

Here, we discern a tactical reason for allowing the jury to see defendant was originally charged with 10 offenses and pleaded guilty to 2. As we have noted, defendant's argument to the jury implied that defendant only pleaded guilty because he had had consensual sex with an underage girl. By suggesting the prior act was consensual, defense counsel attempted to nullify the notion that defendant has a propensity for committing forcible sex acts.

Moreover, even assuming trial counsel's performance was deficient, defendant has not demonstrated that he was prejudiced. To establish prejudice, "[i]t is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.' " (*Richter*, *supra*, 562 U.S. at p. ___ [178 L.Ed.2d at p. 642].) To show prejudice, defendant must show a reasonable probability that he would have received a more favorable result had counsel's performance not been deficient. (*Strickland*, *supra*, 466 U.S. at pp. 693-694; *Ledesma*, *supra*, 43 Cal.3d at pp. 217-218.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, at p. 694; accord, *Ledesma*, at p. 218.)

As for the prison discipline reflected on the documents received into evidence, we note that the notations are not written in language a layperson is likely to understand. One notation reads, "115 Log #I-99-06-063 dated 6-25-99 WC Loss 90 days." The other notation reads, "115 Log #I-99-06-063 WCR 23 days." It is not reasonably probable that these notations impacted the verdict.

More importantly, the prosecution's case against defendant was compelling, especially when combined with the propensity evidence concerning a similar sexual assault. Defendant did not present evidence in his defense, and the defense argument that

16

L.R. had set defendant up and was lying about the incident being nonconsensual was unconvincing. His defense was inconsistent with both L.R.'s testimony and her son's testimony that he woke up and saw his mother crying during the assault. Given the nature of the evidence supporting the charged offense and the prior offense, it is unlikely that the jury would have been prejudiced by learning about defendant's parole violations. Additionally, any potential prejudice flowing from the information in the records about the original ten counts in the P.P. sexual assault and the plea bargain was cured by the court's admonition to the jury to "reach a verdict without any consideration of punishment." Because of the strong case against defendant and because jurors are "presumed to understand and follow the court's instructions," we cannot agree with defendant that the jury used the information about his prior plea agreement to punish him. (See *People v. Holt* (1997) 15 Cal.4th 619, 662.) Accordingly, defendant has not demonstrated that he was prejudiced.

## II. Consecutive Sentences

Defendant argues that the court erred in imposing consecutive sentences for counts one through three because they involved the same victim on the same occasion. The People contend the trial court's implied findings that each of the three counts occurred on separate occasions is supported by substantial evidence and thus, the court properly sentenced defendant to consecutive sentences on all three counts under Penal Code sections 667.61, subdivision (i), and 667.6, subdivision (d).

During sentencing, the court stated, "I am choosing, if I have the choice, to sentence the defendant under Penal Code section 667.6 subdivision (d) which the provision that describes certain violent sex crimes in that looking at [California Rules of Court, r]ule 4.426 subdivision (a) subdivision (2),[9] the crimes were committed, although

---

[9] Further references to rules are to the California Rules of Court in effect at the time of defendant's crimes.

against a single victim, they were committed on separate instances and were separate occurrences." These words imply findings by the trial court that the crimes were committed on separate instances and were separate occurrences.

Section 667.61, subdivision (i), provides that when the crimes "involve the same victim on separate occasions as defined in subdivision (d) of section 667.6," consecutive sentences are mandated. Section 667.6, subdivision (d), defines "separate occasions" as follows: "In determining whether crimes against a single victim were committed on separate occasions under this subdivision, the court shall consider whether, between the commission of one sex crime and another, the defendant had *a reasonable opportunity to reflect upon his or her actions and nevertheless resumed sexually assaultive behavior*. Neither the duration of time between crimes, nor whether . . . the defendant lost or abandoned his or her opportunity to attack, shall be, in and of itself, determinative on the issue of whether the crimes in question occurred on separate occasions." (Italics added.) Consistent with sections 667.61, subdivision (i) and 667.6, subdivision (d), rule 4.426(a)(2) provides, "When a defendant has been convicted of multiple violent sex offenses as defined in section 667.6, the sentencing judge must determine whether the crimes involved separate victims or the same victim on separate occasions. [¶] . . . [¶] If the crimes were committed against a single victim, the sentencing judge must determine whether the crimes were committed on separate occasions. In determining whether there were separate occasions, the sentencing judge must consider whether, between the commission of one sex crime and another, the defendant had a reasonable opportunity to reflect on his or her actions and nevertheless resumed sexually assaultive behavior. A full, separate, and consecutive term must be imposed for each violent sex offense committed on a separate occasion under section 667.6(d)." The standard of proof regarding a finding of separate occasions is proof by a preponderance of the evidence. (*People v. Groves* (2003) 107 Cal.App.4th 1227, 1230, 1231-1232 (*Groves*).) Thus, when the trial court finds the sex offenses occurred on separate occasions, imposition of

18

consecutive sentences is mandatory.  (*People v. Thomas* (1990) 218 Cal.App.3d 1477, 1489.)  As this court has previously noted, we "may reverse only if no reasonable trier of fact could have decided the defendant had a reasonable opportunity for reflection after completing an offense before resuming his assaultive behavior."  (*People v. Garza* (2003) 107 Cal.App.4th 1081, 1092 (*Garza*).)

## A.  Opportunity to Reflect Between the First and Second Rapes

There was a reasonable opportunity for defendant to reflect after the first rape, before resuming his sexually assaultive behavior by committing the second rape.  During this time, defendant allowed L.R. to go into the bathroom and then he asked her what was taking so long.  When L.R. came out, the lights were on and her son was fully awake.  Defendant put a pillow over his face for a moment.  L.R. told defendant she needed to finish cleaning the apartment in an apparent effort to avoid another sexual assault.  Defendant nevertheless resumed the assault by demanding that they were going to have sex again and raping L.R. a second time.  Defendant claims that he was too intoxicated to truly reflect, but that is irrelevant to the question of whether he had a reasonable opportunity to do so.  He clearly did have such an opportunity between the first and second rape.

## B.  Opportunity to Reflect Between the Forcible Oral Copulation and First Rape

The forcible oral copulation and the first rape were closer together temporally, and this presents a more difficult question.  It appears that the act of oral copulation and first act of rape were separated only by defendant's movements from the position he had been in to commit the oral copulation (which is not reflected in the record) to getting on top of L.R. to commit the first act of forcible vaginal intercourse.

As we have noted, around the time the first rape occurred, L.R. told defendant that her son was awake.  The specific testimony was as follows:

"[PROSECUTOR]:  Now, what was *the next thing that happened* after he forcibly orally copulated you?

19

"[L.R.]: Uhm, sex, intercourse. *By that time* I made eye contact with my son, so I seen that my son was up. And I tried to tell him that, you know, you are doing this in front of my son, but once again I was talking too much. I was told to shut the fuck up." (Italics added.)

The record does not specifically reflect to what time period L.R. was referring when she said, "By that time . . . ." However, since she said the next thing that happened after the forcible oral copulation took place was "sex, intercourse," we must take that as the very next thing that actually happened after the forcible oral copulation. Thus, based on this testimony, it appears that her alerting defendant to the fact that her son was awake occurred after defendant began the first act of forcible sexual intercourse.

The People contend that before defendant committed the first rape, L.R. asked defendant if he had a condom and that this provided defendant an opportunity to reflect. We would agree if the People were correct in the sequence of events, but the record does not support their argument. L.R. testified that she asked defendant about the condom *during* the first rape, not before it began. Below is the testimony that immediately followed the above quoted testimony:

"[PROSECUTOR]: So when he forced himself on you to have sexual intercourse, how did that act occur? Tell us what he did.

"[L.R.]: He climbed up on top of me, and I don't know what else way to say it, but he just had his way with me. It was nothing I could do, you know. He's a man. I'm there with two kids. There was nothing I could say that was going to stop him. The only thing I could do was cry and hope that it would be over.

"[PROSECUTOR]: Now, he forced sexual intercourse on you one time or more than one time?

"[L.R.]: No, it was more than once.

"[PROSECUTOR]: So this, we'll call it the first time that he forced sexual intercourse on you, were you still on the couch?

20

"[L.R.]:  Yes.

"[PROSECUTOR]:  And do you know if he was he was wearing a condom or not?

"[L.R.]:  No, he was not.

"[PROSECUTOR]:  And at some point did he stop having sex with you during this first, what we're calling the first time, did he stop?

"[L.R.]:  Just stop, no, there was never a stop.

"[PROSECUTOR]:  Tell us what happened then.  *He's forcing his penis inside of your vagina, correct?*

"[L.R.]:  *Correct.*

"[PROSECUTOR]:  *Then what's the next thing that happens*?

"[L.R.]:  The next thing that happens I'm trying to play it off, you know, being cool and everything, and *I asked well, do you have a condom.*  I don't know him.  I don't know where he's been, you know.  He said no.  And he proceeded on."

Thus, based on the record, it appears that the only thing that took place between the forcible oral copulation and the first rape is that defendant changed his position between sex acts.

Citing *People v. Pena* (1992) 7 Cal.App.4th 1294, defendant asserts that "a defendant's change of position between different sexual acts may be insufficient by itself to provide a reasonable opportunity to reflect upon his actions, 'especially where the change is accomplished within a manner of seconds.' "  However, we note that the *Pena* court did not focus on the defendant's change of position, but rather the defendant's movement of the victim.  In *Pena*, after raping the victim, he then "got off of her, twisted her by the legs violently, and orally copulated her."  (*Pena*, at p. 1299.)  The court held that where the defendant raped the victim and without an "appreciable interval" taking place "simply flipped the victim over and orally copulated her," there was *no cessation of the assaultive behavior* and therefore the defendant could not have *resumed* his assaultive behavior.  (*Id.* at p. 1316.)  Here, unlike in *Pena*, defendant changed his own position, not

21

that of the victim. He changed his position from where he had been pushing the victim's legs apart to facilitate his oral copulation to a position on top of the victim where he committed his first act of forcible vaginal intercourse. *Pena* is informative, but not dispositive.

In *People v. Solis* (2012) 206 Cal.App.4th 1210 (*Solis*), this court discussed the decisional law concerning the "separate occasions" language in section 667.6, subdivision (d), concluding that that language was not unconstitutionally vague. The defendant had contended that the vagueness of the statute was evident from the Courts of Appeal cases in which no single standard had been applied. Reviewing the decisional law, this court found that there was no inconsistency in the application of the statutory language. (*Id*. at p. 1216.)

In *Solis*, this court noted its earlier holding in *People v. Corona* (1988) 206 Cal.App.3d 13 (*Corona*). In *Corona*, the defendant removed the victim's pants, put his finger in her vagina, kissed her genitals and then put his penis in her vagina. (*Solis*, *supra*, 206 Cal.App.4th at p. 1216, citing *Corona*, at p. 15.) As to this sequence of the defendant's crimes, this court concluded there was no evidence of any interval between the sex crimes affording a reasonable opportunity for reflection; there was no cessation of sexually assaultive behavior and consequently, there was no resumption of the defendant's sexually assaultive behavior. (*Solis*, at p. 1217, citing *Corona*, at p. 16.)

This court reviewed other cases as well. (*Solis*, *supra*, 206 Cal.App.4th at pp. 1216-1220.) The common thread in the cases where the evidence supported a finding of "separate occasions" is that something occurred between each of the sex crimes where defendant stopped, even if only momentarily, and then *resumed* his sexually assaultive behavior. (See *People v. King* (2010) 183 Cal.App.4th 1281, 1290 [between acts of digital penetration, the defendant saw the lights of a passing car, removed his fingers from the victim's vagina, looked around uneasily and then inserted fingers from his other hand]; *Garza*, *supra*, 107 Cal.App.4th at pp. 1092-1093 [between forcible oral copulation

22

and rape, the defendant let go of the victim's neck, ordered her to strip, punched her in the eye, put a gun to her head, threatened to shoot her, and took off his own clothes; between forcible digital penetration and rape, the defendant played with the victim's chest, put his gun on the back seat, and pulled the victim's legs around his shoulders]; *People v. Plaza* (1995) 41 Cal.App.4th 377, 380-381 [between first and second sex offense, the defendant moved the victim from the bathroom to the bedroom, forced her onto the bed, grabbed her by the throat and ripped off her underwear; before the next offense, the defendant listened to the victim's answering machine and then punched holes in the wall; before the next offense, he slid down and repeatedly slapped the victim's face and called her names over a period of several minutes].)

Here, there is no evidence of anything occurring between the forcible oral copulation, except a change in position from a position not reflected in the record to getting on top of the victim. No appreciable time period appears to have elapsed. Based on the record before us, there was no cessation of defendant's sexually assaultive behavior and consequently, there was no resumption of that behavior. Accordingly, we must conclude that no reasonable trier of fact could have found that defendant had a reasonable opportunity for reflection between the forcible oral copulation and the first rape. Thus, the trial court's implied finding that these two crimes were committed on "separate occasions" is not supported by substantial evidence.

Our conclusion does not mean the trial court cannot sentence defendant to consecutive sentences on counts one and two. When sex offenses occur on the same occasion, the court has discretion to impose consecutive sentences. (§ 667.6, subd. (c); rule 4.426(b).) However, the court must provide a statement of reasons in support of its discretionary sentencing choice. (Rule 4.426(b); *Groves*, *supra*, 107 Cal.App.4th at p. 1231.) In determining whether to impose a consecutive sentence under section 667.6, subdivision (c), "[t]he sentencing judge is to be guided by the criteria listed in rule 4.425, which incorporates rules 4.421 [aggravating circumstances] and 4.423 [mitigating

circumstances], as well as any other reasonably related criteria as provided in rule 4.408." (Rule 4.426(b).)

Here, the trial court listed a number of aggravating factors at the beginning of its sentencing remarks, including the manner in which the crimes were committed indicates planning (rule 4.421(a)(3)); defendant served a prior prison term (rule 4.421(b)(3)); and defendant's prior performance on parole was unsatisfactory. (Rule 4.421(b)(5).) Later the court said it was "choosing" to impose consecutive sentences, but then said, "if I have the choice." These words suggest the court felt it had no discretion in the matter. The court then said it was imposing consecutive sentences under 667.6, subdivision (d), and rule 4.426(a)(2), further suggesting the court felt it had no discretion. As we have noted, consistent with section 667.61, subdivision (i), rule 4.426(a)(2) provides that "[a] full, separate, and consecutive term must be imposed for each violent sex offense committed on a separate occasion under section 667.6(d)." At no time did the trial court indicate that, if it had discretion in the matter, it would have nevertheless imposed consecutive sentences on counts one and two. Had the court stated it would have exercised discretion to impose consecutive sentences, if it had the discretion to choose between imposing consecutive and concurrent sentences, we would affirm based on the court having identified aggravating factors that are not elements of the offenses. We must remand, however, for the trial court to expressly state it is exercising its discretion to impose or not impose sentences on counts one and two consecutive to one another and if it imposes consecutive sentences, to state the reasons for doing so.

## DISPOSITION

The matter is remanded for the trial court to exercise its discretion regarding whether to impose consecutive or concurrent sentences on counts one and two. The consecutive sentence on count three is affirmed and the judgment is affirmed in all other respects.

24

If the trial court decides to impose consecutive sentences on counts one and two, it must state its reasons for doing so. If the trial court decides to impose concurrent sentences on counts one and two, it shall amend the abstract of judgment and forward the amended abstract to the Department of Corrections and Rehabilitation.

                                                          MURRAY          , J.


We concur:


          RAYE          , P. J.


          HOCH          , J.